Stark LIGON, as Executive Director of the Supreme Court
Committee on Professional Conduct *v.* Larry G. DUNKLIN,
Arkansas Bar No. 81051

04-661                                                    247 S.W.3d 498

Supreme Court of Arkansas
Opinion delivered January 18, 2007

*Michael E. Harmon*, for appellant.

*Richard E. Holiman*, for appellee.

J IM HANNAH, Chief Justice. This is an original action under the Arkansas Supreme Court Procedures Regulating Professional Conduct (Procedures) in which petitioner Stark Ligon, as Executive Director of the Arkansas Supreme Court Committee on Professional Conduct (Committee), seeks the disbarment of respondent Larry G. Dunklin, an attorney licensed to practice law in the State of Arkansas. Our jurisdiction is pursuant to Procedures section 13(A).

On June 9, 2004, the Committee filed a complaint for disbarment against Dunklin, alleging the following facts. In June 1999, First Magnus Financial Corporation agreed to finance a loan to Mark Kimbrough, and Dunklin was chosen to act as closing agent for the loan. On June 17, 1999, Dunklin and Kimbrough signed documents provided by First Magnus, including the mortgage and promissory note, and returned the documents to First Magnus. First Magnus then funded the loan to Kimbrough by wiring the amount of $80,001.51 to Dunklin's IOLTA account at Bank of America. On September 1, 1999, a general warranty deed transferring property to Kimbrough was filed with the Tulsa County Clerk in Tulsa, Oklahoma; however, the mortgage was not filed until February 18, 2000. Thereafter, Kimbrough failed to make payments pursuant to the promissory note with First Magnus.

First Magnus later discovered that the mortgage had not been timely filed. Accordingly, on October 5, 2000, First Magnus filed a complaint for replevin against Dunklin in Pulaski County

Circuit Court. Dunklin failed to file an answer to First Magnus's complaint, and a default judgment in the amount of $96,727.09, plus costs, post-judgment interest, and attorneys' fees was entered against Dunklin on September 28, 2001. The court of appeals affirmed the trial court's decision in October 2002. *See Dunklin v. First Magnus Fin. Corp.*, 79 Ark. App. 246, 86 S.W.3d 22 (2002).

The Executive Director filed the instant complaint for disbarment with this court on June 9, 2004, citing violations of Model Rules 1.15(a), 3.4(c), and 8.4(c). The complaint alleged ten separate counts, which involved three general categories of misconduct: Counts I – VI and VIII involved allegations of Dunklin's mismanagement of his IOLTA account; Counts VII and X alleged that, during the course of the First Magnus suit, Dunklin had falsely stated that he had never represented Kimbrough in a prior matter; and Count IX concerned Dunklin's failure to properly handle the real estate closing involving First Magnus and Kimbrough.

In response to the petition for disbarment, this court appointed the Honorable Jack Lessenberry as special judge to preside over the disbarment proceedings. *See Ligon v. Dunklin*, 358 Ark. 369, 190 S.W.3d 911 (2004). Subsequently, on September 19, 2005, an instrument entitled Stipulated Facts and Agreed Recommendation of Sanction was filed with the special judge. As the title indicates, the instrument was an effort to reach a settlement of the factual issues and an agreement of punishment for violations of the Model Rules of Professional Conduct. The stipulations and agreement were accepted by the special judge, and then filed with this court on September 30, 2005. This was followed by a joint motion of the parties that their recommendation, which was approved by the special judge, be accepted. Subsequently, we denied the parties' motion to waive briefing and for approval of stipulation of sanction and returned the matter to the special judge for further proceedings. *Ligon v. Dunklin*, 364 Ark. 38, 216 S.W.3d 118 (2005).

A hearing on the disbarment complaint was held before Judge Lessenberry on February 6, 2006. At the proceeding, the Committee called Jana Julian Gledhill, vice president and director of risk management of First Magnus; Nancy Hollis, an employee of Bank of America; and Dunklin. Dunklin called the Reverend Willis Walker Jr., and submitted the separately bound depositions

of character witnesses, Circuit Judge Marion Humphrey and former municipal judge Milas Hale.

On April 19, 2006, the proceeding was reopened to hear additional evidence, and at that hearing the Committee introduced a stipulated explanation of complaints that had been lodged against Dunklin. In addition, an exhibit of a prior reprimand of Dunklin was presented and filed without objection.

In his Findings of Fact, Conclusions of Law, and Recommendation of Sanction, Judge Lessenberry concluded that Dunklin violated Model Rules 1.15(a), 3.4(c), and 8.4(c). After hearing evidence related to aggravating and mitigating factors, as well as considering the factors listed in section 19 of the Procedures, the special judge recommended that Dunklin's license to practice law be suspended for three years. He further recommended that Dunklin's law license not be reinstated until and unless the judgment entered in *Magnus v. Dunklin*, No. CV 2000-8954, Pulaski County Circuit Court, be satisfied in full.

The special judge's findings of fact and conclusions of law, as well as his recommended sanction, are now before this court, and both Dunklin and the Committee have appealed from the special judge's decision. Dunklin takes issue with the special judge's findings regarding Counts VII and X. The Committee contends that the special judge's findings with respect to Count VIII are clearly erroneous, that the special judge erred when he disallowed relevant evidence pursuant to Rule 404(b) of the Arkansas Rules of Evidence, and that the special judge failed to consider relevant factors pursuant to section 19 of the Procedures.

### Standard of Review

Section 1(C) of the Procedures provides that disciplinary proceedings are neither civil nor criminal in nature but are sui generis, meaning of their own kind. *See Ligon v. Newman*, 365 Ark. 510, 231 S.W.3d 662 (2006); *Neal v. Hollingsworth*, 338 Ark. 251, 992 S.W.2d 771 (1999). The special judge's findings of fact are accepted by this court unless they are clearly erroneous. *Newman, supra*; *Ligon v. Price*, 360 Ark. 98, 200 S.W.3d 417 (2004). This court imposes the appropriate sanction as warranted by the evidence. *Newman, supra*; *Price, supra*. There is no appeal from this court except as may be available under federal law. *Newman, supra*; *Price, supra*.

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence

is left with a definite and firm conviction that a mistake has been committed. *Newman, supra; Price, supra; Hollingsworth, supra.* The court must view the evidence in a light most favorable to the decision of the special judge, resolving all inferences in favor of his or her findings of fact. *Newman, supra.* Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id.* The purpose of disciplinary actions is to protect the public and the administration of justice from lawyers who have not discharged their professional duties to clients, the public, the legal system, and the legal profession. *Id.* With this standard in mind, we now consider Dunklin's and the Committee's assertions of error.

## Count VII

Dunklin first argues that the special judge erred in finding that there was a violation of Model Rule 3.4(c), as alleged in Count VII of the complaint for disbarment. Following the replevin suit filed against him by First Magnus, First Magnus sought to uncover any of Dunklin's assets to satisfy the judgment. During a deposition, Dunklin was asked whether he knew or had ever previously represented Kimbrough. Dunklin denied representing Kimbrough, but he conceded that he knew him. Despite Dunklin's testimony, however, he had, in fact, represented Kimbrough in a prior criminal matter in 1992. In addition, Dunklin had represented Kimbrough in several real estate transactions in the intervening years.

Count VII of the complaint for disbarment made the following allegations:

40. During the October 30, 2001, deposition, Dunklin denied that he had ever represented Kimbrough in any criminal proceeding.

41. Kimbrough was represented by Dunklin in Pulaski County Circuit Court Case No. 92-915 and Dunklin negotiated a guilty plea on Kimbrough's behalf.

42. By testifying that he had never represented Kimbrough in any criminal proceeding, Dunklin violated Rule 603 of the Arkansas Rules of Civil Procedure [sic], which requires that every witness testify truthfully and Model Rule 3.4(c), which requires a lawyer to not knowingly disobey an obligation under the rules of a tribunal.

Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." The record reveals that in the October 30, 2001 deposition, the following exchange occurred between counsel for First Magnus and Dunklin:

> Q: Prior to the time that this closing took place, did you know Mr. Kimbrough?
>
> A: I knew — yes. Mr. Kimbrough.
>
> Q: Had you ever represented Mr. Kimbrough prior to that time as an attorney?
>
> A: No. I think I had probably been — he had probably consulted with me on some other — on some matters.

Dunklin was questioned about his deposition testimony at the hearing on the disbarment complaint. The following colloquy took place between Dunklin and counsel for the Committee:

> Q: What was your — when you were asked did you know Mr. Kimbrough or had represented him, you denied that, did you not?
>
> A: Well, yes. And I looked back on that and I think that he had asked me you ever — have you represented Mr. Kimbrough prior to that time and I — and — prior to the real estate actions and stuff and I said — I think I said, I've known him, I believe I consulted with him; and then I said, No, I don't think I've represented him.
>
> Q: You represented him previously, though; is that correct?
>
> A: That is correct.
>
> Q: What type of case did you represent him in?
>
> A: Well, what I had clearly overlooked was a '92 criminal action case of some type that I handled in circuit court, Pulaski County Circuit Court. . . . I did represent him. I just absolutely forgot that I had.

. . . .

Q: And I'm presenting you with a copy of a deposition that we had discussed earlier.

A: Yes, sir.

Q: And this was taken October 30th of 200[1], if I'm not mistaken?

A: Yes, sir.

Q: And it is on Page 16 that you were asked, "Had you ever represented Mr. Kimbrough prior to that time as an attorney?" . . . And what was your answer then?

A: "No. I think I had probably been — he had probably consulted with me on some other — on some matters."

Q: And you didn't bring up the fact that you represented him in the criminal case?

A: No, I did not.

Later, Dunklin's counsel questioned Dunklin about the deposition testimony:

Q: Mark Riable, on behalf of Magnus, took your deposition in October, I believe, of 2001, is what I believe the date of the deposition is. . . . At that time under questioning . . . you were asked had you ever previously represented . . . Mr. Kimbrough, and at one time you said no?

A: Yes.

Q: Now. You've been able — at that time were you — were you attempting to deceive anybody, Mark Riable or the Court or anybody, the Committee, in reference to denying that answer?

A: Oh, absolutely not. I mean, this — this is a matter of record.

Q: Right.

A: I clearly represented Mark Kimbrough in a felony criminal action in Pulaski County Circuit Court. There is no question. That's a matter of record.

. . . .

Q: And we're talking nine years earlier from the date of when you were being deposed?

A: That is correct.

Q: Is my math right? Eight or nine?

A: That is correct.

Q: Larry, tell the judge what — in the years during the '90s, how many — what was your caseload like? What was your client caseload like, files that you opened?

A: I had hundreds of cases on — open up at any given time. My practice was primarily a criminal practice. I was in court two to three times a week on criminal cases. This is just one case. By the time of '91, I had had thousands of cases that I had represented individuals on.

. . . .

Q: And you answered a question about whether you previously represented somebody nine years earlier?

A: Yes.

Q: But it's your testimony that you just simply didn't recall?

A: I absolutely forgot. There's no way, and I had no reason. It's just too easy just to say, yeah, yeah, I did represent him in the matter. I absolutely forgot that I had.

Dunklin argues that, given the fact that no evidence was presented to refute his explanation of simple oversight, the special judge was left to conjecture in concluding that Dunklin knowingly disobeyed an obligation under the rules of a tribunal to testify truthfully.

With respect to Count VII, the special judge made the following findings:

> Mr. Dunklin's attorney made a compelling argument that his client simply forgot an unremarkable representation some nine years earlier. If that were all there was, it should be easy to accept.
>
> In the deposition, Dunklin testified that he had knowledge that Kimbrough had been a defendant in a criminal matter. Secondly, Mr. Dunklin's association with Kimbrough was not an isolated transaction. Dunklin testified that he had possibly four other real estate transactions with Kimbrough. When Kimbrough brought the legal work to Dunklin it could not have been later than June 17, 1999, the date of Instructions to Escrow. This was less than seven years after the no contest plea statement date of August 6, 1992.
>
> Also bearing on the credibility of Dunklin was his explanation that Kimbrough would tell him the amounts for checks and Dunklin would comply without inquiry or explanation.
>
> For these several reasons, it is found that Dunklin did not testify truthfully when he denied that he had been an attorney for Kimbrough in a criminal matter.

■ Clearly, the special judge's findings regarding this violation were based on his review of the testimony and evidence in this case. The special judge had the benefit of hearing the witnesses' testimony and was better suited in assessing the credibility of those witnesses. It is axiomatic that disputed facts and determination of the credibility of witnesses are within the province of the fact-finder. *Newman, supra; Neal v. Matthews*, 342 Ark. 566, 30 S.W.3d 92 (2000). Accordingly, we cannot say that any of the special judge's findings related to Count VII are clearly erroneous.

## Count X

Dunklin next argues that the special judge erred in finding a violation of Model Rule 8.4(c), as alleged in Count X of the complaint for disbarment. Again, the allegations pertain to Dunklin's deposition testimony. Count X alleged:

> 50. During the October 30, 2001, deposition, Dunklin denied that he had ever represented Kimbrough in any criminal proceeding.

51. Kimbrough was represented by Dunklin in Pulaski County Circuit Court Case No. 92-915 and Dunklin negotiated a guilty plea on Kimbrough's behalf.

52. By testifying that he had never represented Kimbrough when he had in fact represented Kimbrough in 1992, Dunklin engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation and, therefore, violated Model Rule 8.4(c).

■ Rule 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Dunklin contends that, since the special judge was clearly erroneous in finding that Dunklin knowingly violated a tribunal rule, as alleged in Count VII, it should follow that he did not engage in conduct involving fraud and deceit since such a state of mind would require intent to do so at the time he gave the deposition. Because we have already determined that the special judge's finding that Dunklin knowingly violated a tribunal rule, as alleged in Count VII, was not clearly erroneous, Dunklin's argument fails. Again, disputed facts and determination of the credibility of witnesses are within the province of the fact-finder. *Newman, supra.* We cannot say that the special judge's findings related to Count X are clearly erroneous.

## Count VIII

We now turn to the Committee's arguments on appeal.[1] The Committee submits that the special judge clearly erred in concluding that there was no violation of Rule 8.4(c), as alleged in Count VIII of the complaint for disbarment. Count VIII made the following allegations:

43. On June 24, 1999, Dunklin issued check number 1304 on his IOLTA account to "Pulaski Bank and Trust" in the amount of $433.60 knowing that he did not have $433.60 of his personal funds in the account.

44. By issuing a check drawn on his IOLTA in the amount of $433.60 knowing that he did not have $433.60 of his personal funds in the account, Dunklin engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation and, therefore, violated Model Rule 8.4(c).

---

[1] Dunklin did not file a response to the Committee's arguments.

The Committee contends that the special judge erred when he found that Dunklin did not have the requisite mental state of knowing that he did not have $433.60 of his personal funds in his IOLTA account. Nancy Hollis, Vice President of Corporate Investigations at Bank of America, testified that the beginning balance of Dunklin's trust account for the period from June 1, 1999, through June 30, 1999, was a negative $23.38. Hollis testified that there were four deposits during the month of June 1999. The first deposit was made on June 3 in the amount of $500. The second deposit, a settlement check for $4,000 written to Lenora White, A Single Individual & Larry Dunklin, Her Attorney, was deposited on June 15. The third deposit, cash in the amount of $600, was made on June 22. The fourth deposit was a wire transfer made on June 23 in the amount of $80,001.51. The total deposits made during the month of June 1999, not including the wire transfer, were $5,100. Of the $5,100 deposited, $4,000 was settlement proceeds for a client, leaving $1,100 in unidentified funds deposited in the account.

According to Hollis, there were thirteen withdrawals and debits made on the account during the month of June 1999. Check number 1230 was written to Gans Building Partnership on June 15, 1999, in the amount of $1,335.60. The check was noted as being for "office rental." Check number 1301 was written on June 12 or June 22, 1999, in the amount of $1,000 to Walker and Dunklin for "overhead." Check number 1302 was written on June 23, 1999, to "cash" in the amount of $2,200. Check number 1304 was written on June 24, 1999, to Pulaski Bank and Trust in the amount of $433.60 for payment on a personal auto loan. The total amount of the checks written on or before June 24, 1999, totaled $4,969.20. Dunklin testified that, based on the evidence presented at the hearing, he did not have sufficient funds in his trust account until June 23, 1999, to pay checks 1230, 1301, 1302, and 1304.

As to the allegations in Count VIII of the complaint for disbarment, the special judge made the following findings:

> Count VIII charges a violation of Model Rule 8.4(c) by Dunklin issuing check number 1304 on his IOLTA account to pay a personal car loan. Specifically paragraphs 43 and 44 use the same words "knowing that he did not have $433.60 of his personal funds in the account. . . ."

> Who did Dunklin target with dishonesty, fraud, deceit, or misrepresentation?

> Since there was no evidence either directly or indirectly that Dunklin had knowledge it must be concluded that a violation of Model Rule 8.4(c) was not proved.

The Committee avers that with the evidence presented and the testimony of Hollis and Dunklin, it is clear that there were no personal funds in Dunklin's IOLTA account in excess of the total amount of the personal checks written by him during the month of June 1999. Thus, the Committee argues that the findings made by the special judge with regard to Count VIII are clearly erroneous and, therefore, should not be accepted by this court.

The Committee does not address the special judge's finding that it failed to prove that Dunklin had knowledge that he did not have $433.60 of his personal funds in the account when he wrote the check in that amount. Without this proof, a violation of 8.4(c) cannot be sustained. Certainly, Hollis's testimony (and the accompanying exhibits) showed that Dunklin wrote a check for $433.60 for a personal loan when he did not have $433.60 of his personal funds in the account. Dunklin admitted as much at the hearing after he was presented with the evidence. What the Committee fails to demonstrate, however, is that Dunklin *knew at the time he wrote the check* in the amount of $433.60 for his personal loan that he did not have that amount in personal funds in his IOLTA account. Consequently, we cannot say that the special judge's findings with regard to Count VIII are clearly erroneous.

### Admission of 404(b) Evidence

The Committee next argues that the special judge erred when he disallowed relevant evidence pursuant to Rule 404(b) of the Arkansas Rules of Evidence. During Dunklin's testimony, he was asked whether there were any instances, other than instances shown in previously admitted exhibits, wherein he wrote a check on his IOLTA account to anyone other than a client, a third-party medical provider, or to himself for fees. Dunklin testified that he was not sure. He further testified that, if there were any other checks written, it was through some error of his.

The Committee then attempted to offer the following exhibits, under Rule 404(b) of the Arkansas Rules of Evidence, to show a pattern of Dunklin's using money in the IOLTA trust

account to pay for personal obligations and to show that Dunklin did not simply make an inadvertent error:

(1) Exhibit 14, Check No. 1286, payable to Pulaski Bank and Trust in the amount of $433.60, drawn on his IOLTA Trust Account and dated April 22, 1999;

(2) Exhibit 15, Check No. 1287, payable to Walker, Campbell, and Dunklin in the amount of $1,037, drawn on his IOLTA Trust Account and dated April 27, 1999;

(3) Exhibit 16, Check No. 1289, payable to Gans Building Partnership for rent in the amount of $667.80, drawn on his IOLTA Trust Account and dated April 29, 1999;

(4) Exhibit 17, Check No. 1290, payable to Governor's Park for May rent in the amount of $659, drawn on his IOLTA Trust Account and dated May 5, 1999;

(5) Exhibit 18, Check No. 1298, payable to Pulaski Bank and Trust in the amount of $433.60 for payment on a loan, drawn on his IOLTA Trust Account and dated May 24, 1999;

(6) Exhibit 19, Check No. 1318, payable to Walker and Dunklin in the amount of $1,000, drawn on his IOLTA Trust Account and dated September 13, 1999;

(7) Exhibit 20, Check No. 1320, payable to Gans Building Partnership for September rent in the amount of $669.60, drawn on his IOLTA Trust Account and dated September 30, 1999;

(8) Exhibit 21, Check No. 1330, payable to Gans Building Partnership for October rent in the amount of $669.60, drawn on his IOLTA Trust Account and dated October 10, 1999;

(9) Exhibit 22, Check No. 1338, payable to Gans in the amount of $636, drawn on his IOLTA Trust Account and dated December 10, 1999; and

(10) Exhibit 23, Check No. 1346, payable to Walker and Dunklin in the amount of $1,121, drawn on his IOLTA Trust Account and dated January 26, 2000.

Dunklin responded by stating that the Committee had never provided him with copies of these checks prior to the hearing, and that the checks were written in a time period not covered by the

complaint. The special judge allowed the admission of Exhibit 17, the check made payable to Governor's Park for May rent dated May 5, 1999, finding that it was a test of Dunklin's memory and showed Dunklin's state of mind around the period of time that is alleged in the complaint for disbarment. Exhibit 18, the check made payable to Pulaski Bank and Trust in the amount of $433.60 for payment on a loan and dated May 24, 1999, was also admitted into evidence; the special judge found it to be within the general range of time that was alleged in the complaint for disbarment.

The remaining exhibits, Exhibits 14, 15, 16, 19, 20, 21, 22, and 23 were not admitted into evidence because the special judge deemed the exhibits to be beyond the range of time alleged in the complaint for disbarment and because Dunklin had not been provided copies of the exhibits. The Committee states that, in this matter, it was alleged in the complaint for disbarment that Dunklin controlled a certain IOLTA trust account at Bank of America, and that there were approximately seven counts in the complaint concerning the IOLTA trust account. It is the Committee's contention that when Dunklin testified that the checks written in June 1999, which were for personal obligations, must have been due to a mistake, he opened the door for Exhibits 14, 15, 16, 19, 20, 21, 22, and 23 to be introduced because these exhibits were written on the same IOLTA trust account as the ones specifically listed in the complaint and because most of them were written to cover the same personal obligations.

■ The Arkansas Rules of Evidence apply to disbarment proceedings. See Ark. S. Ct. P. Regulating Prof'l Conduct of Atty's at Law § 13(A). It is within the discretion of the fact-finder to limit the testimony of witnesses and those decisions will not be reversed absent a manifest abuse of discretion. See, e.g., Garner v. Kees, 312 Ark. 251, 848 S.W.2d 423 (1993); Bennett v. State, 297 Ark. 115, 759 S.W.2d 799 (1988). Here, the special judge disallowed the admission of the evidence at issue because Dunklin had not been given notice that the Committee planned to introduce the evidence at the hearing. In Ligon v. Price, 360 Ark. 98, 120, 200 S.W.3d 417, 431 (2004), we held that "matters . . . not included in the petition for disbarment are not to be allowed in that particular proceeding unless the pleadings are amended and notice given to [the] respondent attorney." In light of our holding in Price, as well as the special judge's discretion in admitting evidence, we hold

that the special judge did not abuse his discretion in excluding testimony and evidence regarding Exhibits 14, 15, 16, 19, 20, 21, 22, and 23.

### Recommendation of Sanction

Finally, the Committee argues that there are relevant factors the special judge failed to address in his findings upon recommendation of the appropriate sanction for Dunklin. When Model Rules have been violated by either serious or lesser misconduct, a penalty phase proceeds where the defendant attorney and the Director are allowed to present evidence and arguments regarding aggravating and mitigating factors to assist in determining the appropriate sanction. *Newman, supra; Price, supra; Hollingsworth, supra.* Aggravating factors developed by the American Bar Association Joint Committee on Professional Standards and adopted by this court in *Wilson v. Neal*, 332 Ark. 148, 964 S.W.2d 199 (1998), are:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with [the] rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge [the] wrongful nature of [the] conduct;

(h) vulnerability of [the] victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution;

(k) illegal conduct, including that involving the use of controlled substances.

Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify [the] consequences of [the] misconduct;

(e) full and free disclosure to [the] disciplinary board or cooperative attitude towards [the] proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

> (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
>
> (2) the chemical dependency or mental disability caused the misconduct;
>
> (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
>
> (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in [the] disciplinary proceedings;

(k) impositions of other penalties or sanctions;

(l) remorse;

(m) remoteness of prior offenses.

*Id.* at 163-64, 964 S.W.2d at 207 (quoting Model Standards for Imposing Lawyer Sanctions §§ 9.22, 9.32 (1992)).

As for aggravating factors, Judge Lessenberry concluded that there appeared to be a pattern of abuse of Dunklin's IOLTA account, and that Dunklin regularly made payments of cash to

himself from his account. Also noted was that Dunklin had a prior reprimand for failing to appeal a client's conviction in federal court. As for mitigating factors, Judge Lessenberry noted that Dunklin submitted evidence regarding his good work for the community, including Dunklin's serving on the Crime Reparations Board and the Board of Trustees for the University of the Ozarks. The special judge also noted that an annual award for crime victim service was created in Dunklin's name. Judge Lessenberry found that Dunklin had experienced an extremely difficult divorce that did not end upon the filing of a decree in 1997. In addition, the special judge noted that, in 1998, Dunklin lost his house in a fire. And, finally, he determined that Dunklin's infractions did not result from dishonest or selfish motives, and that Dunklin had genuine remorse for his actions.

In addition to any other considerations permitted by these Procedures, a panel of the Committee, in imposing any sanctions, shall consider:

A. The nature and degree of the misconduct for which the lawyer is being sanctioned.

B. The seriousness and circumstances surrounding the misconduct.

C. The loss or damage to clients.

D. The damage to the profession.

E. The assurance that those who seek legal services in the future will be protected from the type of misconduct found.

F. The profit to the lawyer.

G. The avoidance of repetition.

H. Whether the misconduct was deliberate, intentional or negligent.

I. The deterrent effect on others.

J. The maintenance of respect for the legal profession.

K. The conduct of the lawyer during the course of the Committee action.

L. The lawyer's prior disciplinary record, to include warnings.

M. Matters offered by the lawyer in mitigation or extenuation except that a claim of disability or impairment resulting from the use of alcohol or drugs may not be considered unless the lawyer demonstrates that he or she is successfully pursuing in good faith a program of recovery.

*See* Ark. Sup. Ct. P. Regulating Prof'l Conduct of Att'ys at Law § 19.

The Committee argues that, although the special judge's recommendation was within the prescribed range of sanctions, and the judge specifically stated that he used the section 19 factors in reaching his decision, the special judge failed to address "certain other factors" in his findings. First, the Committee contends that the special judge failed to address the loss or damage to the client. The Committee states that First Magnus relied upon the assurances made by Dunklin that its money interest had been protected and, as a result, it wired $80,001.51 into Dunklin's IOLTA Trust Account, only to see its security interest in the property disappear as other lenders were able to obtain priority over the unsecured interest of First Magnus. The Committee further states that, while First Magnus has obtained a judgment against Dunklin, it is still owed $80,001.51, plus interest, to date.

We first note that First Magnus was not, as the Committee admits, one of Dunklin's clients. Nevertheless, it is clear that the special judge recognized the loss sustained by First Magnus. The special judge specifically found that "First Magnus . . . was vulnerable [due] to the failure of its closing agents to cause the filing of documents."

Second, the Committee states that the special judge failed to consider that Dunklin's actions damaged the legal profession since "the complaining party was from Arizona and the reputations of those currently engaged in the legal profession in Arkansas have been damaged to some degree a result of the conduct of [Dunklin]." The Committee offers no evidence regarding the Arizona public's general opinion of Arkansas attorneys. Further, there is no evidence that the special judge failed to consider any of the factors set out in section 19; rather, he declined to make written findings as to each factor he considered. It appears that the Committee believes that, pursuant to section 19, the special judge is required to make written findings regarding each factor. There is no such requirement in the rule.

We now turn to the specific sanction recommended in this case. Section 17 of the Procedures divides violations of the Model Rules into two separate categories of misconduct: serious misconduct and lesser misconduct. Ark. Sup. Ct. P. Regulating Prof'l Conduct of Att'ys at Law § 17(B)-(C). Serious misconduct warrants a sanction of terminating or restricting a lawyer's license to practice law, whereas the lesser misconduct does not. *Price*, 360 Ark. at 114, 200 S.W.2d at 427. Conduct will be considered serious misconduct if any of the following considerations set forth in Section 17(B) apply:

(1) The misconduct involves the misappropriation of funds;

(2) The misconduct results in or is likely to result in substantial prejudice to a client or other person;

(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the lawyer;

(4) The misconduct is part of a pattern of similar misconduct;

(5) The lawyer's prior record of public sanctions demonstrates a substantial disregard of the lawyer's professional duties and responsibilities; or

(6) The misconduct constitutes a "Serious Crime" as defined in these Procedures.

■ The special judge noted that there appeared to be a pattern of abuse of Dunklin's IOLTA account, and that Dunklin had a prior disciplinary action that resulted in a reprimand. Based on these findings, the special judge clearly concluded that Dunklin's conduct constituted "serious misconduct," which is grounds for one or more of the following sanctions: disbarment, suspension, interim suspension, reprimand, caution, warning, or probation. *See* Ark. Sup. Ct. R. Regulating Prof'l Conduct of Att'ys at Law § 17(D). The special judge recommended that Dunklin's law license be suspended for three years, *see id.* § 17(D)(2), and that his law license not be reinstated until and unless the judgment entered in *Magnus v. Dunklin*, No. CV 2000-8954 be satisfied in full. *See id.* § 18(C). Based on our review, we conclude that the findings of fact and conclusions of law are not clearly erroneous. We accept Judge Lessenberry's report and recommendation for sanction.

GLAZE, J., dissents.

DANIELSON, J., not participating.

TOM GLAZE, Justice, dissenting. The majority opinion sets forth the facts fairly well, but it is the application of the law to those facts that troubles me. The special judge found that Mr. Dunklin violated Model Rule 3.4(c) when, during a deposition, he denied having represented Mark Kimbrough in any criminal proceedings. Because testifying falsely is prohibited by Ark. R. Evid. 603, and Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal," the judge concluded that Dunklin had violated Model Rule 3.4(c). Dunklin changed his testimony later when he admitted having previously represented Kimbrough in a criminal case. Dunklin further changed his earlier testimony by conceding that he represented Kimbrough in four real estate transactions. The special judge concluded that Dunklin was untruthful in these matters.

The special judge also found that Dunklin violated Model Rule 8.4(c), which provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. Again, the special judge found ample evidence to hold that Dunklin knowingly violated a tribunal rule. Regarding these two violations of the Model Rules, the special judge was correct on these two counts.

At this point, however, I take issue with Dunklin and the special judge's suggestion that Dunklin did not violate Rule 8.4(c) in handling his IOLTA or trust account by writing checks on that account to pay his personal obligations. The special judge made the following findings:

> Count VIII charges a violation of Model Rule 8.4(c) by Dunklin issuing check number 1304 on his IOLTA account to pay a personal car loan. Specifically paragraphs 43 and 44 use the same words "knowing that he did not have $433.60 of his personal funds in the account . . . ."
>
> Who did Dunklin target with dishonesty, fraud, deceit, or misrepresentation?
>
> Since there was no evidence either directly or indirectly that Dunklin had knowledge, it must be concluded that a violation of Model Rule 8.4(c) was not proved.

The majority opinion reflects the special judge's finding that the Committee failed to prove that Dunklin had knowledge that

he did not have $433.60 of his personal funds in the account when he wrote the check in that amount, but Dunklin conceded this fact. In addition, Nancy Hollis, Vice President of Corporate Investigations at Bank of America, testified regarding Dunklin's trust account for the period from June 1, 1999, through June 30, 1999. Hollis said that the balance during this period was a negative $23.38. Dunklin failed to show why his trust account had a negative balance. Hollis further examined Dunklin's trust account and noted that there were four deposits in the account. Again, Dunklin made no attempt to explain how or why unidentified funds were in the account. Most important, Dunklin conceded that, through June 23, 1999, he wrote four personal checks: 1) to the Gans Building Partnership "for rent," in the amount of $1,335.60; 2) for $1,000 to Walker & Dunklin for "overhead"; 3) for $2,200 made out to "cash"; and 4) for $433.60 made out to Pulaski Bank and Trust for a personal auto loan. The total amount of the checks written on or before June 24, 1999, when Dunklin wrote the auto loan check, clearly exceeded the balance maintained in the account. And indeed, Dunklin testified that, *based on the evidence presented at the hearing, he did not have sufficient funds to cover the four checks.* (Dunklin testified, "I would say that, prior to June 23, 1999, . . . I did not have sufficient funds in my account to pay for the overhead of $1,335.60, overhead of $1,000, the cash withdrawal of $2,200, and the car payment of $433.60.") In fact, Dunklin repeatedly testified as to how he unlawfully misused his trust account; that testimony was clearly contrary to the judge's findings, and it is reason to reverse this case.

The majority opinion countenances these plain violations and misuses of Dunklin's trust account by saying that the Committee failed to show that Dunklin knew, at the time that he wrote the $433.60 check for his personal loan, that he did not have that amount in personal funds in his IOLTA account. How this satisfies Dunklin's trust account problems, I cannot fathom, as an attorney is not supposed to be writing personal checks out of his trust account. That account is for the purpose of holding monies for third parties, not to pay personal obligations or debts.

The Committee further argues that the special judge was wrong to exclude some eight exhibits, comprised of various checks written by Dunklin, that were offered by the Committee to show a pattern of Dunklin's use of money from his IOLTA trust account to pay his personal obligations and to show that Dunklin did not simply make an inadvertent error. Dunklin testified that the checks

written in June 1999 were for personal obligations and must have been due to a mistake. Dunklin also claimed that the Committee never provided him with copies of the other checks, which Dunklin had written during a period from February of 1999 through December of 1999, and that these checks were written in a time period not covered by the complaint.

The problems with Dunklin's arguments are several. First, the checks are indisputably from his trust account; consequently, he cannot claim to have been surprised by their existence when the Committee proffered them. Second, the checks were offered in a composite exhibit under Ark. R. Evid. 404(b) to show a pattern of abuse by which Dunklin unlawfully used his trust account to pay his personal obligations. Dunklin testified that he knew he had a duty to clients or third parties to account for funds that came into his possession. Third, Dunklin, by his own testimony, opened the door for the Committee to prove that Dunklin continued his unlawful use of his trust account. Dunklin testified that the June 1999 checks written to the Gans Building or to Walker & Dunklin for overhead out of the trust account "must have been through some error of mine." The Committee should have been permitted to question Dunklin about the checks from months other than June 1999 to show that the checks written in June were not the result of a mistake or inadvertence. Under Rule 404(b), evidence of other bad acts is admissible to show "absence of mistake." The special judge simply erred when he wrongly excluded these additional checks.[1] Dunklin also admitted his personal money should not have been in his trust account, but he nonetheless knowingly wrote checks from that account to pay his debts.

Finally, I take issue with this court's decision to suspend Dunklin for only three years. The violations that the special judge found to have occurred are serious ones. Had the special judge recommended disbarment, I would have agreed that such a punishment would have been appropriate. When an attorney has violated Model Rule 8.4(c) by being untruthful to the court, and has also been shown to have converted a client's funds for the attorney's personal use, it is my belief that the attorney should be disbarred, or at the least, be suspended from the practice of law for five years. *See* Ark. S. Ct. P. Regulating Prof'l Conduct of Att'ys at Law § 17B; *see also Neal v. Hollingsworth,* 338 Ark. 251, 992 S.W.2d

---

[1] The Committee presented evidence that Dunklin had a negative balance at the end of July 1999 to show that Dunklin continued his pattern of abuse of his trust account.

771 (1999) (where the evidence demonstrated a pattern of misconduct in which attorney misappropriated clients' funds and concealed his wrongdoing, such misconduct could only be characterized as serious, substantial, and egregious, and disbarment was the "only appropriate sanction"); *Ligon v. Newman*, 365 Ark. 510, 231 S.W.3d 662 (2006) (disbarment appropriate where evidence showed a pattern of abuse involving the misappropriation of funds as well as deceit, dishonesty, and misrepresentation). Such a result would comport with the spirit of our Rules of Professional Conduct, which require an attorney to conduct his affairs so as to "inspire the confidence, respect, and trust of clients and the public." *See* Ark. R. Prof'l pmbl. 13A.