2013 Ark. 259

**John Skylar "Sky" TAPP, Petitioner**

v.

**Stark LIGON, as executive Director of the Arkansas Supreme Court Committee on Professional Conduct Respondent.**

**No. CV–13–150.**

Supreme Court of Arkansas.

June 20, 2013.

Rehearing Denied Sept. 5, 2013.

Jeff Rosenzweig, for petitioner.

Stark Ligon, Office of Professional Conduct, Little Rock, for respondent.

DONALD L. CORBIN, Justice.

Petitioner, John Skylar "Sky" Tapp, an attorney licensed to practice law in Arkansas since 1976, petitions this court for a writ of certiorari to vacate an interim suspension of his law license while disbarment proceedings are pursued against him by Respondent Stark Ligon, as Executive Director of the Arkansas Supreme Court Committee on Professional Conduct ("Committee"). In seeking the writ, Tapp asserts that the interim suspension should be dissolved and replaced with such reasonable conditions as this court may impose. Tapp argues that there will be no irreparable harm to the public, his clients, or the judicial system if the suspension is vacated. He further argues that when this court examines the entire record we should conclude that it is not likely that he will ultimately be disbarred. Our jurisdiction of this petition is pursuant to section 16(E) of the Procedures of the Arkansas Supreme Court Regulating Professional Conduct of Attorneys at Law ("Procedures"). For the reasons explained below, we deny Tapp's petition for a writ of certiorari.

The record reveals that Panel B of the Committee voted in December 2012 to institute disbarment proceedings against

Tapp as the result of two separate cases before the Committee. The panel also voted to impose an interim suspension on Tapp pursuant to sections 16(A)(1) and 17(E)(3) of the Procedures. The first case is CPC Docket No. 2012–047, wherein the Office of Professional Conduct ("OPC") instituted a formal complaint against Tapp as a result of a referral by United States Bankruptcy Court Chief Judge Richard D. Taylor. According to the evidence before Panel B, Tapp and Marilyn and William Fenimore formed an Arkansas company, G.F.S.T., LLC (GFST), to purchase property in Panama City, Florida. Tapp owned a one-half interest in GFST, while the other half was owned by Garrett–Fenimore, LLC, a business entity formed by the Fenimores. GFST purchased one property in Panama City, and Tapp, personally, purchased another piece of property in Bay County, Florida, which he pledged as additional collateral for the Panama City property owned by GFST. Following a downturn in the market, GFST could no longer make payments on its property, nor was Tapp able to make payments on his personal property, and both went into foreclosure. On February 7, 2012, a "Final Judgment of Foreclosure" was entered in favor of Regions Bank against GFST, Tapp, Garrett–Fenimore, and others in the amount of $825,165, plus interest. A judicial sale was scheduled for July 6, 2012.

After entry of the foreclosure order, Tapp, acting pro se, filed two bankruptcy actions on March 8, 2012, in Arkansas. The first was a handwritten, personal Chapter 13 petition that was assigned docket number 12–bk–70931. Therein, Tapp listed as an asset a one-half owner-ship interest in GFST that he valued at $350,000 and that was subject to a $700,000 secured claim to Regions Bank. He also listed on his personal financial statement the one-half interest in GFST; the Panama City property, listed as a "negative" asset of $350,000; and the Bay County property, valued at $550,000 and noted as pledged on the same Regions Bank note for the Panama City property. The foreclosure proceeding in Florida was not disclosed in this action.

Tapp, again acting pro se, filed a second Chapter 13 bankruptcy petition, docketed as number 12–bk–70933, on behalf of GFST. Therein, Tapp listed as "Joint Debtors" Marilyn and William Fenimore, as the co-owners of GFST. He also listed the Panama City property as an asset, subject to the Regions note and mortgage.

The bankruptcy trustee filed a motion to dismiss docket number 12–bk–70933 on March 23, 2012, claiming federal law allows only individuals to file a Chapter 13 action. That same day, the trustee also moved to dismiss docket number 12–bk–70931 on the basis that Tapp was ineligible to proceed under Chapter 13. The petitions were ultimately dismissed, but Chief Judge Taylor ordered Tapp to show cause, and a hearing was held on April 12, 2012. At that hearing, Tapp admitted that there was a pending judicial-foreclosure sale for both the Panama City and Bay County properties. He also admitted that he filed the two bankruptcy petitions to stay or delay the foreclosure proceedings in Florida. While Tapp admitted that he did not intend to make the Fenimores Chapter 13 debtors, he also admitted that he did not represent them.[1] At the conclusion of the hearing, Chief Judge Taylor announced

---

1. The Fenimores filed an adversary proceeding against Tapp in Arkansas, bankruptcy docket No. 12–ap–07036, seeking compensatory and punitive damages, for the unauthorized filing by Tapp of the GFST bankruptcy petition. The Fenimores subsequently dismissed this action.

that he was forwarding this matter to the Committee because of his concern that Tapp had admitted putting the Fenimores into bankruptcy when Tapp was not their attorney.

The panel asserted that, based on the evidence before it, Tapp had violated the following Arkansas Rules of Professional Conduct: (1) Rule 1.1, by demonstrating a lack of legal knowledge, skill, thoroughness, and preparation reasonably necessary for representation; (2) Rule 1.4(a)(1), by failing to acquire the Fenimores' consent before listing them as joint debtors on the bankruptcy petition; (3) Rule 3.1, by bringing a proceeding that had no basis for being filed; (4) Rule 3.3(a), by knowingly making a false statement of law; (5) Rule 3.4(b), by providing false evidence in purporting to have the authority to file for bankruptcy on behalf of GFST; (6) Rule 4.4(a), by using means that had no substantial purpose other than to embarrass, delay, or burden a third person; (7) Rule 8.4(c), by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and (8) Rule 8.4(d), by engaging in conduct that is prejudicial to the administration of justice.

The second case against Tapp is CPC Docket No. 2012–049, which stems from Tapp's representation of Dr. Katharine Hurst; she is also Tapp's first cousin. According to the information presented to Panel B, Tapp began representing Dr. Hurst in her divorce from Dr. Kevin Rudder in 2005. A decree of divorce was entered January 2, 2008, and provided that each party was entitled to one-half of $13,368, from proceeds realized from the sale of their marital residence. Tapp was initially ordered to hold these funds on behalf of Dr. Hurst in his client-trust account pending resolution of an appeal. The appeal was decided on September 9, 2009, and Tapp filed one last pleading on

behalf of Dr. Hurst in May 2011. After failing for several years to obtain her one-half of the escrowed funds, Dr. Hurst filed a grievance with the OPC. The OPC wrote Tapp a letter dated June 6, 2012, informing him of the grievance filed by Dr. Hurst. Tapp replied by letter, dated June 21, 2012, stating that he had paid the money owed Dr. Hurst to her bankruptcy trustee on June 19, 2012. He paid the $6,611.82 to the trustee by check # 3046 from his client-transaction account, drawn on Malvern National Bank.

Following Tapp's reply letter, the OPC requested that Tapp provide his monthly statements for his client-transaction account for the period beginning April 2006 through June 2012, so that it could verify that the $6,611.82 belonging to Dr. Hurst had continuously remained in his client-trust account. Tapp complied, and the records from Malvern National Bank revealed that the client-trust account had fallen below that amount on at least eighteen occasions, going as low as $6 in March 2011.

In its complaint and supplemental complaint on the Hurst matter, the OPC alleged that Tapp violated the following Rules of Professional Conduct: (1) Rule 1.15(a)(1), by failing to hold his client's property separate from his own property; (2) Rule 1.15(a)(4), by failing to accurately maintain his trust-account records; (3) Rule 1.15(b)(1), by failing to deposit client funds in a separate, clearly identifiable trust account; (4) Rule 1.15(b)(3), by depositing nonclient funds in a client-trust account well in excess of the $500 allowed under the rule; (5) Rule 1.16(d), by failing to disburse his client's funds upon termination of representation; and (6) Rule 8.4(c), by making a false and misleading statement to the OPC that Dr. Hurst's funds had remained safeguarded in his client-trust account at all times.

Tapp filed answers to the complaints, disputing the factual allegations and alleged rules violations asserted by the OPC. According to Tapp, he never intentionally violated any rules. With regard to the bankruptcy matter, Tapp stated that he was following the advice of a friend, who was a bankruptcy attorney, and that he mistakenly listed the Fenimores on the petition as joint debtors instead of co-debtors because of his inexperience with bankruptcy law. Moreover, Tapp denied that he ever intended to represent the Fenimores in bankruptcy without their consent, as evidenced by the fact that he listed their Florida attorney's name and address on the bankruptcy petition. Finally, Tapp contended that he believed he was authorized to file for bankruptcy on behalf of GFST because he was a fifty-percent owner. As to the Hurst matter, Tapp asserted that Dr. Hurst's bankruptcy attorney informed him that the funds belonging to Dr. Hurst could be paid only to the bankruptcy trustee at the conclusion of her appeal in the divorce matter, that there was no request by the trustee or her bankruptcy attorney to disburse those funds, and that her funds were always available. While Tapp admitted that his bookkeeping was insufficient, he averred that Dr. Hurst's funds were never missing and that he had paid them out of his earned fees in a different client-trust account maintained at Arvest Bank. According to Tapp, he had left an earned fee from another client in his client-trust account per an agreement with that client pending any outstanding Medicare issues that might arise. To support this claim, Tapp attached an affidavit from the client.

Upon review, Panel B of the Committee entered two separate orders and findings on December 28, 2012. Therein, the panel found that Tapp had violated each of the rules alleged in the complaints and that he had committed serious misconduct.

The panel ordered disbarment proceedings to be initiated and imposed an interim suspension of Tapp's law license. In reaching these decisions, the panel noted that Tapp's prior disciplinary record was a factor in its decision.

On December 31, 2012, Tapp filed a motion for dissolution or modification of the interim suspension, pursuant to section 16(B) of the Procedures. At that same time, he also submitted an affidavit in rebuttal, refuting what he deemed to be "erroneous factfindings" by Panel B. On February 19, 2013, the panel denied Tapp's motion for dissolution or modification and ordered the interim suspension to be filed with this court's clerk.

Tapp then filed the instant petition for writ of certiorari on February 22, 2013, as well as a motion for accelerated consideration. We granted the motion for accelerated consideration, ordered briefing by the parties, and temporarily stayed the interim suspension. We turn now to the merits of Tapp's petition.

Pursuant to section 17(E) of the Procedures, when a panel of the Committee finds that an attorney has violated any provision of the Arkansas Rules of Professional Conduct, the panel is authorized to temporarily suspend the attorney's privilege to practice law pending a final adjudication and disposition of the disciplinary matter. According to section 17(E)(3), an interim suspension shall be appropriate in the following situations:

(a) Immediately on decision to initiate disbarment;

(b) Immediately upon proof that the attorney has been found guilty of a Serious Crime in any jurisdiction, notwithstanding pending post-conviction actions; and,

(c) When a panel of the Committee is in receipt of sufficient evidence demon-

strating that the lawyer has engaged or is engaging in misconduct involving:

    (i) Misappropriation of funds or properly;

    (ii) Abandonment of the practice of law; or,

    (iii) Substantial threat of serious harm to the public or to the lawyer's clients.

Where an interim suspension has been imposed, an attorney may submit to the executive director an affidavit in rebuttal of the evidence before the panel of the Committee and a request for the dissolution or modification of the interim suspension. *See* Ark. Sup.Ct. P. Regulating Prof'l Conduct § 16(B). If the request is denied, the attorney may then petition this court for a writ of certiorari as set forth in section 16(E) of the Procedures, which provides as follows:

> Upon the filing of a petition for a writ of certiorari with the Clerk after final action by the Committee or its panel imposing an interim suspension on an attorney, the Arkansas Supreme Court, in its discretion, may decide whether to review the imposition of the interim suspension and may take any action regarding the interim suspension which it determines is appropriate.

It is by way of section 16(E) that we are here. This Procedure was adopted in 2011. *See In re Procedures of the Ark. Sup. Court Regulating Prof'l Conduct of Attorneys at Law*, 2011 Ark. 242 (per curiam). The instant petition presents us with an issue of first impression, as this court has heretofore not addressed section 16(E). Accordingly, we must determine an appropriate standard to be utilized in reviewing such petitions.

Tapp asserts that the closest procedure to one such as this is a preliminary injunction. This court has explained that in determining whether to issue a preliminary injunction or a temporary restraining order, a circuit court must consider two things: (1) whether irreparable harm will result in the absence of an injunction or restraining order, and (2) whether the moving party has demonstrated a likelihood of success on the merits. *Potter v. City of Tontitown*, 371 Ark. 200, 264 S.W.3d 473 (2007). We agree with Tapp that an interim suspension to practice law is akin to a preliminary injunction. In fact, other jurisdictions have treated it as such. *E.g., In re Discipline of Trujillo*, 24 P.3d 972 (Utah 2001); *People v. Varallo*, 913 P.2d 1 (Colo.1996) (per curiam), *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996); *In re Malvin*, 466 A.2d 1220 (D.C.1983) (per curiam); *see also* Francis M. Dougherty, Annotation, *Validity and Construction of Procedures to Temporarily Suspend Attorney from Practice, or Place Attorney on Inactive Status, Pending Investigation of, and Action Upon, Disciplinary Charges*, 80 A.L.R.4th 136 (1990).

In *Malvin*, the Court of Appeals for the District of Columbia reasoned that the temporary suspension of an attorney pending the completion of a disciplinary proceeding had the same effect as a preliminary injunction barring that attorney from the practice of law. The court then explained that it was necessary to apply the standards governing the issuance of a preliminary injunction but adapted to the context of a professional-disciplinary proceeding. *Id.* The Supreme Court of Utah, relying on the decision in *Malvin*, adopted the following four-factor standard in analyzing the propriety of an attorney's interim suspension: (1) whether the public will suffer irreparable harm unless the order of interim suspension issues; (2) whether the threatened injury to the public outweighs whatever damage the proposed order may cause the attorney temporarily sus-

pended from the practice of law; (3) whether the proposed order, if issued, would be adverse to the public interest; and (4) whether there is a substantial likelihood, based on all the available evidence, that a significant sanction will be imposed on the attorney at the conclusion of any pending disciplinary proceedings. *Trujillo*, 24 P.3d 972. We are persuaded by the court's reasoning in *Trujillo* and adopt the aforementioned factors to be utilized when considering a petition such as the instant one.

■ We now review those factors in light of the facts in this case. The first question we must answer is whether the public will suffer irreparable harm unless the order of interim suspension issues. Tapp argues that there will be no irreparable harm if he is allowed to continue practicing law. According to Tapp, there are no allegations here of substance abuse, no allegations of criminal activity, or any allegations of missing funds. But, we cannot say that an interim suspension will be necessary only in one of these circumstances enumerated by Tapp. Here, among its many other findings, Panel B specifically found that Tapp violated rules of professional conduct involving client representation in that he demonstrated a lack of legal knowledge, skill, thoroughness, and preparation. Whether by intention or mistake, Tapp purported to represent the Fenimores, without their consent, and ultimately made them joint debtors in a bankruptcy action that he admitted was filed for the sole purpose of delaying the foreclosure proceedings in Florida. All of this was done despite Tapp's experience with bankruptcy proceedings. As Panel B found, Tapp was experienced in bankruptcy court, having appeared as counsel of record in at least eighteen bankruptcy cases in Arkansas since 1987, including three Chapter 13 cases. Moreover, the evidence before the panel established that Tapp failed to properly manage the funds in his client-trust account, and would not turn funds over to his client, Dr. Hurst, until she filed a grievance with the OPC. Finally, Panel B found that Tapp committed numerous violations of the model rules, some of which constituted serious misconduct. We simply cannot agree with his assertion that there is no risk of harm to the public or to his clients.

We must next analyze whether the threatened injury to the public outweighs whatever damage the proposed order of suspension may cause Tapp. While we are mindful of Tapp's assertion that he has a busy law practice and that his clients will be harmed if they are forced to find new representation, we cannot ignore the serious nature of Tapp's misconduct. Harm has already befallen Tapp's former business partners, the Fenimores, because of his actions in the GFST bankruptcy petition. Moreover, Panel B found that Tapp was able to pay the funds he owed to Dr. Hurst and her trustee due only to large deposits of funds from other sources in the months preceding the issuance of the check to Dr. Hurst. Panel B further found that Tapp's assertion that Dr. Hurst's funds had continuously remained in his client-trust account was a false statement. In light of this evidence, we conclude that the threat of further harm to clients or to the public certainly outweighs any damage Tapp might sustain as a result of the temporary suspension.

The third factor is whether the order of suspension, if issued, would be adverse to the public interest. Again, we are mindful of Tapp's assertion that he has a busy law practice. And, while he may have clients who will be forced to seek new legal representation, we cannot agree with Tapp that it is more reasonable to allow him to continue practicing law with certain restric-

tions in place, including the appointment of a monitor for Tapp's practice. Tapp points to section 17(E)(7) of the Procedures, which allows the appointment of a monitor for a lawyer placed on probation, but we do not find such an appointment to be appropriate under the facts of this case. Here, we cannot say that an order of suspension will be adverse to the public interest when there are numerous allegations of serious misconduct by Tapp.

Finally, we must consider whether there is a substantial likelihood, based on all the evidence, that a significant sanction will be imposed on Tapp. The Committee is seeking the disbarment of Tapp, based on the findings of misconduct in both the bankruptcy and Dr. Hurst matters. In addition to the evidence supporting the findings of misconduct, we also have to consider Tapp's prior disciplinary record. In thirty-seven years of practicing law, Tapp has accumulated one warning, six cautions, and six reprimands as a result of attorney misconduct. In light of these prior disciplinary proceedings and the serious nature of the alleged misconduct in the latest two cases, it is reasonable to conclude that a suspension, or possible disbarment, will result.

Accordingly, upon consideration of the aforementioned four factors, we cannot say that the Committee's decision to impose an interim suspension on Tapp's license to practice law was improper. We therefore deny Tapp's petition for writ of certiorari to dissolve or modify the order of suspension. The temporary stay of the interim suspension is also vacated.

Petition denied.

BAKER and HART, JJ., concur in part; dissent in part.

JOSEPHINE LINKER HART, Justice, dissenting.

I agree that, given our consistency in imposing serious sanctions where an attorney purloins a client's funds, an interim suspension is warranted in CPC Docket 2012–049, the Dr. Hurst case involving discrepancies in Attorney Tapp's client trust account. I, however, do not believe that is appropriate for the companion case, CPC Docket 2012–047, the case involving Attorney Tapp's mishandling of two Chapter 13 bankruptcy petitions. Furthermore, I think that the standard used to evaluate petitions to lift the interim suspension, which the majority has adopted, is problematic and contrary to our precedent.

In my view, the purpose of an interim suspension is not to punish but instead to protect the public from a serious risk of harm. Our decision to grant a writ of certiorari to lift an interim suspension should be guided by two core considerations: a suspended attorney's right to due process and our constitutional duty, imposed by amendment 80, to regulate the practice of law in order to protect the public at large and the attorney's clients. Regarding the former, we have long recognized an attorney's right to a hearing before rescinding his right to practice law. *Stanley v. Ligon*, 374 Ark. 6, 285 S.W.3d 649 (2008); *Ex parte Burton*, 237 Ark. 441, 445, 373 S.W.2d 409, 411 (1963); *Beene v. State*, 22 Ark. 149 (1860). Accordingly, where the actions of the attorney or the significance of his conduct are subject to a legitimate dispute, due process requires a hearing where live testimony and other evidence may be received.

Imposition of an interim suspension at the ballot-vote stage is appropriate only when allegations of serious attorney misconduct are not legitimately disputed. *See, e.g., Todd v. Ligon*, 356 Ark. 187, 148 S.W.3d 229 (2004). In those instances,

where there are no significant material facts in dispute, and where we have imposed disbarment or a lengthy suspension for similar conduct, an interim suspension may be appropriate to protect the liberty and pecuniary interests of the persons who have placed their trust in the attorney. Attorney Tapp's conduct in CPC Docket 2012–049 meets this criteria. There is no dispute that the balance in Attorney Tapp's client trust account fell well below the $6,611.82 of Dr. Hurst's money that he was charged with safeguarding. Furthermore, we have consistently dealt with an attorney's mishandling of client money with the most severe sanctions. *See Ligon v. McCullough*, 2009 Ark. 165A, 303 S.W.3d 78. In *McCullough*, we said, "In issues of misuse or misappropriation of a client's money, the slightest divergence from rectitude breaches the oath, the trust between attorney and client, and the confidence that the public must be able to place in the profession."

It was no accident that Attorney Tapp advocated "preliminary injunction" analysis in support of his petition to vacate the interim suspension. Preliminary injunctions are used primarily to maintain the status quo. *Citizens' Pipe Line Co. v. Twin City Pipe Line Co.*, 183 Ark. 1006, 39 S.W.2d 1017 (1931). In this case, the status quo means lifting the interim suspension and allowing Attorney Tapp to maintain his law practice. According to Attorney Tapp, the test should be 1) whether the plaintiff (in this case the Committee) will suffer irreparable harm if the conduct is not ceased and 2) whether the plaintiff will prevail on the merits. Inexplicably, the majority claims to "agree" with Attorney Tapp, but goes on to adopt an entirely different test, which it fails to apply.

In my view, the standard for evaluating interim suspensions that was promulgated by the supreme court of Utah in *In re Discipline of Trujillo*, 24 P.3d 972 (Utah 2001), does not comport with the 150 years of Arkansas precedent favoring the right of an attorney to a hearing, unless such a hearing would serve no meaningful purpose. It is troubling that the majority attaches so little value to an accused attorney's right to due process.

Moreover, the four-part analysis in *Trujillo* is, at best, problematic. The promise of scientific-like precision of the *Trujillo* test is mere illusion. The problem lies in how to assign weight to each factor. For example, in Arkansas, the solo practitioner is the backbone of the legal system. Suspension of a solo practitioner's license would be devastating to his or her practice, so, from the accused attorney's perspective, the harm is infinitely severe. Accordingly, the *Trujillo* factors have a disparate impact on solo practitioners—and their clients—who must now find new representation, as opposed to large firms that could conceivably shift the caseload in-house. Furthermore, the clients of a suspended attorney who have not been directly affected by the accused attorney's misconduct are denied the services of their attorney of choice even though they neither want nor need such "protection." These innocent clients are now forced to find new representation, which will often mean that they must forfeit a substantial amount of the fees that they have paid to their now suspended attorney of choice—new representation will not have the knowledge that the suspended attorney acquired while working up the case.

Equally problematic is how to determine when the "public" is injured or faces injury. In almost every instance of attorney misconduct, save for those in which an entire client trust account is looted, only a single party is directly affected by an attorney's misconduct. Accordingly, with

the exception of financial malfeasance, it is blatant speculation to project an attorney's unethical conduct beyond the harm actually caused to the affected party. Thus, three of the factors in the four-part analysis in *Trujillo*—(1) whether the "public" will suffer irreparable harm unless the order of interim suspension issues, (2) whether the threatened injury to the "public" outweighs whatever damage the proposed order may cause the attorney temporarily suspended from the practice of law, and (3) whether the proposed order, if issued, would be adverse to the "public" interest—purports to protect an entity that is not defined, and may not even exist in any practical, tangible sense.

The majority opinion proves that the *Trujillo* factors are unworkable. Even though the majority attempts to characterize the facts of the bankruptcy case to satisfy the first prong of the *Trujillo* test, it fails to do so. First, it cannot decide whether Attorney Tapp's actions were by "intention or mistake." In fact, bankruptcy judge Richard D. Taylor, the only person involved in this case to actually hear live testimony from Attorney Tapp, could not make that call himself Second, the majority has not explained why the alleged injury to the Fenimores, who were Attorney Tapp's business partners, may be legitimately elevated to the level of "irreparable harm to the public."

The majority's analysis involving the second *Trujillo* factor, whether the threatened injury to the public outweighs whatever damage the proposed order may cause the attorney temporarily suspended from the practice of law, is likewise flawed. While the majority acknowledges that Attorney Tapp has a "busy law practice," despite the clear wording of the test that it espouses, they afford it *no weight* in balancing his interest in a thriving practice

against the "threatened" injury to the public.

Even less compelling is the majority's analysis regarding the third *Trujillo* factor, whether the proposed order, if issued, would be adverse to the public interest. The conclusory statement that it will not be "adverse" to the public interest because there are numerous "allegations" of serious misconduct is not analysis and does not even address whether the "order" it is speaking about is the interim suspension or the proposed writ of certiorari that would lift the interim suspension. It is troubling that the majority finds the "allegations" sufficient to justify suspending an attorney's license to practice law.

Finally, in analyzing the fourth *Trujillo* factor, whether there is a substantial likelihood, based on all the evidence, that a significant sanction will be imposed, the majority does not focus on the conduct in the cases before it, but on the fact that in 37 years of law practice, Attorney Tapp had "accumulated" one warning, six cautions, and six reprimands as a result of attorney misconduct. The fact that Attorney Tapp has previously been sanctioned is not predictive of how the Committee will dispose of the current allegations.

Nonetheless, given our case law concerning the sanctions for financial impropriety, and the absence of disputed facts, I am mindful that there *is* a substantial likelihood that a significant sanction will be imposed—in the Dr. Hurst case. Therefore, I concur in the majority's disposition.

BAKER, J., joins.