Cite as 2025 Ark. 87

# SUPREME COURT OF ARKANSAS
**No.** D–16–301

|  |  |
|---|---|
| | **Opinion Delivered:** May 29, 2025 |
| ROBERT BRECH, AS EXECUTIVE DIRECTOR OF THE ARKANSAS SUPREME COURT COMMITTEE ON PROFESSIONAL CONDUCT <br>                PETITIONER <br><br> V. <br><br> TERESA LYNETTE BLOODMAN, ATTORNEY AT LAW, ARKANSAS BAR NO. 2005055 <br>               RESPONDENT | PETITION FOR DISBARMENT [NOS. CPC NO. 2014-053; CPC NO. 2014-067; CPC NO. 2015-013; CPC NO. 2015-016; CPC NO. 2015-020; CPC NO. 2015-029; CPC NO. 2015-088; CPC NO. 2015-092; AND CPC NO. 2015-108] <br><br> HONORABLE KIM M. SMITH, SPECIAL JUDGE ON ASSIGNMENT <br><br><br> <u>ORDER OF DISBARMENT ISSUED</u>. |

**KAREN R. BAKER, Chief Justice**

This is an original action brought under the Arkansas Supreme Court Procedures Regulating Professional Conduct of Attorneys ("Procedures"). Robert Brech, as Executive Director of the Supreme Court Committee on Professional Conduct (the "Committee"), seeks the disbarment of Teresa Lynette Bloodman, an attorney licensed to practice law in Arkansas. Our jurisdiction is pursuant to Procedures section 13(A).

## I. *Facts and Procedural History*

On April 1, 2016, Stark Ligon, former Executive Director of the Committee, filed a petition for disbarment against Bloodman. This petition was amended four times to incorporate additional matters and allege further violations of the Arkansas Rules of Professional Conduct ("Rules"). On April 28, we appointed special judge Kim Smith to

preside over this matter and provide the court with findings of fact, conclusions of law, and recommendations of an appropriate sanction. *Ligon v. Bloodman*, 2016 Ark. 191 (per curiam).

In total, the Committee alleged 176 violations of the Rules stemming from Bloodman's conduct in at least fifteen separate matters. The disbarment proceedings were bifurcated into two phases. The first phase was the allegations phase, and the hearing took place across several dates from 2018 through early 2019. The forty-two-volume record for the allegations phase spans over 7,700 pages. On May 9, 2023, the special judge entered findings of facts and conclusions of law wherein he detailed his findings over 236 pages. The second phase was the sanctions phase, and the hearing took place on June 22 and August 21, 2023. On February 2, 2024, the special judge entered his findings of fact, conclusions of law, and recommendation of sanction, wherein he recommended that Bloodman be disbarred. Upon a review of the record, we accept the special judge's findings and recommendation.

## II. *Standard of Review*

Section 1(C) of the Procedures provides that "[d]isciplinary proceedings are neither civil nor criminal in nature but are *sui generis*, meaning of their own kind." *See* Procedures § 1(C); *see also Ligon v. Dunklin*, 368 Ark. 443, 447, 247 S.W.3d 498, 503 (2007). We will accept the special judge's findings of fact unless they are clearly erroneous. *Ligon v. Tapp*, 2017 Ark. 185, at 2, 519 S.W.3d 315, 318. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Ligon v. Newman*, 365 Ark. 510, at 516, 231 S.W.3d 662, 667 (2006). We must view the evidence in a light most favorable

to the decision of the special judge, resolving all inferences in favor of his or her findings of fact.[1] *Ligon v. Stewart*, 369 Ark. 380, 384–85, 255 S.W.3d 435, 439 (2007). Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Newman*, *supra*. We impose the appropriate sanctions based on the evidence. *Id.* There is no appeal from this court except as may be provided by federal law. *Id.*

### III. *Preliminary Issues*

### A. Procedural Due Process

As an initial matter, Bloodman contends that the Committee violated her right to procedural due process because it imposed an interim suspension of her law license without providing her notice and a hearing.

In March 2016, the Committee's order of interim suspension was issued with its disbarment referral pursuant to section 16(A)(1) of the Procedures. Section 16(A)(1) provides that "[a]n action for the interim suspension of a lawyer is initiated, adjudicated, and imposed in the following manner: . . . Pursuant to Section 17(E)(3)(a), an interim

---

[1]Bloodman cites *Ligon v. Price*, 360 Ark. 98, 200 S.W.3d 417 (2004), asserting that we must instead view the evidence in a light most favorable to the responding attorney and resolve all inferences in favor of the responding attorney. However, that is a misstatement of our standard of review. We clarified in *Newman*, *supra*, that

> [w]e erroneously stated in *Price*, 360 Ark. 98, 200 S.W.3d 417, that we view the evidence in the light most favorable to the respondent. We now take the opportunity to clarify our standard of review. As previously stated, this court will accept the special judge's findings unless they are clearly erroneous. Here, as in *Price*, the special judge found that the respondent committed serious misconduct warranting disbarment; thus, in order to view the evidence in the light most favorable to Mr. Newman, we would be forced to disregard the findings of the special judge. This we will not do.

*Newman*, 365 Ark. at 516, 231 S.W.3d at 667.

3

suspension may be imposed immediately upon a panel's decision to institute disbarment action on any formal complaint pending before it[.]" Section 17(E)(3)(a) of the Procedures provides that

> [w]hen a panel of the Committee finds that an attorney has violated any provision of the Rules, the panel is authorized . . . [t]o temporarily suspend the lawyer's privilege to practice law pending final adjudication and disposition of a disciplinary matter. Interim suspension shall be appropriate in the following situations: (a) Immediately on decision to initiate disbarment[.]

On March 22, 2016, the Committee filed its interim-suspension order, and Bloodman's law license has been suspended since that date. Bloodman subsequently filed a petition for writ of certiorari challenging the Committee's order of interim suspension. *See Bloodman v. Ligon*, 2016 Ark. 309, at 1 (per curiam). She argued, in relevant part, that she was denied procedural due process of law because she was not afforded a hearing prior to her suspension and that the factors adopted by this court in *Tapp v. Ligon*, 2013 Ark. 259, 428 S.W.3d 492, did not support the interim suspension. On September 15, we remanded to the Committee for entry of a new order with an analysis of the *Tapp* factors. *See Bloodman v. Ligon*, 2016 Ark. 309, at 1–3. On October 4, the Committee entered its revised findings and order, stating that an analysis of the *Tapp* factors demonstrated that the interim suspension of Bloodman's law license during the pendency of the disbarment proceeding was appropriate. On October 27, we denied Bloodman's petition, and the interim suspension remained in place. *Bloodman v. Ligon*, CV-16-434 (formal order, Oct. 27, 2016).

At the outset of the June 22, 2023 sanction hearing of the disbarment proceedings, Bloodman asserted that this court had an opportunity to "revisit" this due-process issue in *Hutchinson v. Arkansas Supreme Court Committee on Professional Conduct, Panel A*, 2023 Ark.

4

86, 666 S.W.3d 82. Bloodman claimed that *Hutchinson* supported her position—that the proceedings should be dismissed because her license was suspended without an opportunity to be heard in violation of her due-process rights—because the court stated that the interim suspension of an attorney's license should only occur primarily after notice and a hearing. The special judge declined to dismiss the disbarment proceedings on this basis, reasoning as follows:

> Well, that issue went to the Arkansas Supreme Court, and they granted no relief to Ms. Bloodman, and you know maybe if it had occurred now, maybe they would have given relief under [*Hutchinson*]. I agree. And they've said that they prefer that it not be done, and they have the authority to change those rules because they make those rules on the professional conduct rules, but you know, we're here at the end and towards the sanction -- doing the sanction hearing to determine the sanctions, so this case is almost at conclusion, and you know, since it's been ruled on before, that issue in this very case, I'm going to deny your motion again to stop the proceedings[.]

Here, relying on *Hutchinson*, *supra*, Bloodman argues once more that this court has expressed its preference that the Committee provide an attorney with notice and a hearing before suspending his or her law license on an interim basis. Bloodman acknowledges that the March 22 and October 4, 2016 orders of interim suspension predate the court's decision in *Hutchinson* but nevertheless urges us to find that she renewed her procedural due-process argument at the June 22, 2023 sanctions hearing. For this reason, Bloodman asserts that the special judge should have complied with *Hutchinson*'s mandate to put an end to interim suspensions of an attorney's license to practice law without notice and a hearing. The Committee responds that we have already rejected Bloodman's procedural due-process arguments and should do so once more. The Committee further asserts that, notwithstanding the court's prior decision, the Procedures do not require pre-suspension

5

hearings and that the court in *Hutchinson* did not mandate otherwise; rather, it merely declared its preference for such hearings.

As noted by the Committee, we have already unanimously rejected the argument that the Procedures authorizing Bloodman's interim suspension violated her procedural due-process rights, and upon a review of the entire record, we are not persuaded to reconsider this ruling. *See Bloodman v. Ligon*, CV-16-434 (petition for writ of certiorari denied). And even if the special judge had been required to overlook our prior ruling and reconsider Bloodman's due-process arguments in light of *Hutchinson*, the outcome would still be the same. In *Hutchinson*, the Committee suspended William Asa Hutchinson III's law license after he was arrested during a traffic stop. 2023 Ark. 86, at 1, 666 S.W.3d at 83. A majority of this court reasoned as follows:

> [T]his court *prefers* that the Committee and the Director provide an attorney with notice and a hearing before issuing any interim suspension. *We recognize the current rules permitted the Committee's action here. Ark. Sup. Ct. P. Regulating Prof'l Conduct § 16(A). And* ex parte *interim suspensions may be justified in other cases, particularly when the conduct arises from an attorney's practice of law*. But here, this was a rapid summary suspension for conduct unrelated to petitioner's practice as a lawyer.

*Id*. at 2, 666 S.W.3d at 83 (emphasis added).

In other words, *Hutchinson* did not mandate pre-suspension hearings prior to the Committee ordering the interim suspension of an attorney's law license in all cases, nor do our Procedures require such a hearing. Here, the allegations giving rise to the disbarment action against Bloodman stemmed from her practice of law and the misuse of her law license, which is the type of conduct for which the majority in *Hutchinson* suggested that an interim suspension may be justified. Therefore, Bloodman's reliance on *Hutchinson* is misplaced.

Accordingly, the special judge did not err in finding that Bloodman's procedural due-process arguments had been brought to finality in *Bloodman v. Ligon*, *supra*, and we decline to reconsider our earlier ruling.

## B. Service

Bloodman next argues that we should dismiss the petition for disbarment because the Committee did not comply with Rule 4 of the Arkansas Rules of Civil Procedure.

On June 16, 2016, Bloodman filed a motion to dismiss the April 1 petition for disbarment, arguing that she had never been personally served with the petition or summons despite the affidavit of service filed on May 24, 2016, that showed that Bloodman had been served on May 18. Bloodman asserted that the disbarment petition should be dismissed because the Committee did not comply with the Arkansas Rules of Civil Procedure, generally identifying "insufficiency of process pursuant to Rule l2(b)(4) and insufficiency of service of process pursuant to Rule l2(b)(5)" as deficiencies. Bloodman explained that

> [s]pecifically, service of process was insufficient because the Affidavit of Service is false; that is, not only was [Bloodman] not personally served with the disbarment complaint, but she was not at the residence listed at the time that the Affidavit of Service reflects that service was completed. To that end, the facts alleged in the Affidavit of Service are alarmingly false.

On July 19, the special judge held a motions hearing during which he heard arguments on Bloodman's motion to dismiss. The special judge was tasked with determining whether Bloodman was properly served on May 18 as set forth in the affidavit of service, and the arguments made by both Bloodman and the Committee were centered on the accuracy of the process servicer's account detailed in the affidavit of service—namely,

7

whether Bloodman was present at her home address at the time of service, and whether the process server listed the correct address on the affidavit of service.

The process server, Andrew Myers, testified that he surveilled Bloodman's home between approximately 2:30 and 7:30 p.m. on May 18, 2016. Myers testified that around 7:10 p.m., a vehicle pulled into Bloodman's driveway, and a teenage boy exited the vehicle and began walking to the front door of the home. Myers testified further that he immediately pulled up to Bloodman's home when the other vehicle arrived, and as Bloodman opened the door to let the teenager inside, Myers and Bloodman looked at each other as he loudly stated that he had legal documents for her and informed her that she had been served. Myers claimed that Bloodman then slammed the door, and he therefore placed the box of documents on her doorstep and announced through the door that she had been served and that the papers were outside. Yet Bloodman asserted that she was not at home during the period Myers claimed to have been monitoring the residence and that she was in Pine Bluff at the time of alleged service. Bloodman also challenged the accuracy of the affidavit of service because it reflected that she was served at a home in Bryant, but the actual location of her home address was in Benton. Myers alleged that he had served Bloodman at the same address once before—a point at which he claimed Bloodman attempted to evade service—and that he mistakenly wrote "Bryant" as opposed to "Benton" on the affidavit of service because his map indicated that Bloodman's address was in Bryant. While there was discussion about which city Bloodman's residence was located in, it was undisputed that the address was 5528 Lexington Avenue.

After hearing arguments from the parties and testimony from Bloodman and Myers, the special judge denied Bloodman's motion to dismiss, finding that service was proper. In reaching this decision, the special judge weighed the credibility of the witnesses and ultimately determined that, in light of the affidavit of service, Bloodman failed to carry her burden of proving that service was improper. On August 8, the special judge entered a written order memorializing his findings. During a short recess at the July 19 hearing, in the presence of at least three witnesses, Bloodman was personally served in the courtroom with a box containing the same materials that Myers testified to leaving on her doorstep on May 18—the summons, original petition for disbarment, and related exhibits.

## 1. *Standard of review*

As an initial matter, Bloodman contends that the special judge improperly shifted the burden of proving sufficient service of process to her when that burden lies with the party responsible for obtaining service of process—here, the Committee.

However, we have held that a return of service is prima facie evidence of valid service. *See Unknown Heirs of Warbington v. First Cmty. Bank*, 2011 Ark. 280, at 6, 383 S.W.3d 384, 387. The party claiming that service was not had, has the burden of proof to overcome the prima facie case created by the proof or return of service. *Id.* Here, Myers signed the May 24 affidavit of service wherein he swore that he served Bloodman on May 18 with a true copy of the summons, notice, petition for disbarment, and exhibits. At that point, the burden shifted to Bloodman, as the party claiming that service was not had, to overcome the prima facie case of proper service created by the filing of the affidavit of

9

service. Thus, the special judge did not improperly shift the burden of proving sufficient service of process to Bloodman.

## 2. *Insufficient process*

Bloodman now argues that the April 1 petition for disbarment should be dismissed because the summons did not comply with Rule 4(b)(3) of the Arkansas Rules of Civil Procedure. With respect to the required form of a summons to be issued and served in accordance with the Arkansas Rules of Civil Procedure, Rule 4(b)(3) provides that

> [t]he summons shall be styled in the name of the court and issued under its seal, dated and signed by the clerk or a deputy clerk, and directed from the State of Arkansas to the defendant to be served. It shall contain . . . (3) the name and address of the plaintiff's attorney, if any, otherwise the address of the plaintiff[.]

Ark. R. Civ. P. 4(b)(3).

Here, Bloodman argues that the summons issued on April 5, 2016, did not strictly comply with Rule 4(b)(3), specifically because it did not state the name and address of the Committee's then-attorney Stark Ligon. Bloodman argues that the April 1 petition for disbarment must therefore be dismissed. The Committee responds that Bloodman has waived this argument because she did not argue, either in her motion to dismiss or during the subsequent hearing, that because Ligon's name and address had been omitted, the summons was defective for noncompliance with Rule 4(b)(3). Rather, the Committee asserts that Bloodman's motion to dismiss only generally alleged that the disbarment petition should be dismissed for "insufficiency of process pursuant to Rule l2(b)(4), and insufficiency of service of process pursuant to Rule 12(b)(5)" of the Arkansas Rules of Civil Procedure.

10

We agree that Bloodman has waived her argument concerning the April 5, 2016 summons. At no point before the special judge did Bloodman argue that the summons was defective pursuant to Rule 4(b)(3) because it did not include Ligon's name and address. Bloodman did not raise this argument in her June 16 motion to dismiss or during the July 19 hearing during which the special judge heard arguments related to the May 18 service of process. Instead, her arguments before the special judge were focused on the veracity of the process server's affidavit of service. Bloodman participated in the disbarment proceedings and submitted to the court's jurisdiction for over eight years before raising the argument that the summons issued on April 5, 2016, did not strictly comply with Rule 4(b)(3) because it did not state Ligon's name and address. This argument was raised for the first time in her opening brief before this court, which was filed in July 2024, and was, simply put, raised too late. Accordingly, Bloodman waived her argument that the April 5, 2016 summons did not strictly comply with Rule 4(b)(3) on the basis of its failure to state the name and address of the Committee's attorney, and we decline to address it.

3. *Insufficient service of process*

As an additional basis for dismissal of the April 1 petition for disbarment, Bloodman asserts that the Committee did not serve her in compliance with Rule 4(f)(1)(A) of the Arkansas Rules of Civil Procedure. Rule 4(f)(1)(A) mandates that service of process inside the state shall be made as follows:

> (1) *Natural Persons.* If the defendant is a natural person at least 18 years of age or emancipated by court order, by:
>
> > (A) delivering a copy of the process to the defendant personally, or if he or she refuses to receive it after the process server makes his or her purpose clear, by leaving the papers in close proximity to the defendant[.]

11

Ark. R. Civ. P. 4(f)(1)(A).

Whether service was had in a case is a question of fact. *See Unknown Heirs of Warbington, supra.* Here, Bloodman argues that the process server did not comply with Rule 4 because he did not deliver the summons and petition for disbarment to Bloodman personally, and Bloodman could not have refused to receive any papers from him—thereby permitting him to leave the papers in close proximity to her pursuant to Rule 4(f)(1)(A)— because she was not at her home at the time of the alleged service. Bloodman disagrees with the special judge's credibility determinations, citing a number of alleged inconsistencies between Myers's testimony at the July 19 hearing and his affidavit of service as evidence that allegedly undermines the conclusion that she had been properly served. However, Bloodman's disagreement with the findings of fact does not demonstrate error in the special judge's assessment. The special judge's finding that the May 18 service was proper was based on his review of the testimony and evidence in this case. The special judge had the benefit of hearing the witnesses' testimony and was better suited in assessing the credibility of those witnesses. *See Dunklin*, 368 Ark. at 452, 247 S.W.3d at 505–06. Accordingly, we cannot say that the special judge's factual findings were clearly erroneous, and we decline to dismiss the April 1 petition for disbarment on this basis.

IV. *Merits*

As discussed above, the hearing on the allegations phase of Bloodman's disbarment proceeding took place from 2018 through early 2019. After the presentation of all testimony and evidence, the special judge ordered the Committee and Bloodman to submit simultaneous proposed findings of fact and conclusions of law ninety days after the transcript

of the proceedings was provided to the parties. On January 18, 2023, once the record was ultimately completed and after numerous extensions of time to file the proposals were granted, the special judge ordered the Committee and Bloodman to submit simultaneous proposals by January 24. Both parties submitted proposals in accordance with the special judge's order, and they each filed objections to the opposing set of proposed findings of facts and conclusions of law thereafter. On May 4, the special judge issued a letter opinion stating that the Committee's proposal aligned more closely with the judge's findings and conclusions. Therefore, the special judge ordered the Committee to prepare the findings of fact and conclusions of law using its proposal as a starting point but ordered the Committee to make numerous specific revisions to conform to the evidence and the judge's rulings. On May 9, the special judge entered findings of facts and conclusions of law detailing his findings and conclusions over 236 pages, to which Bloodman objected.

The hearing on the sanctions phase took place on June 22 and August 21, 2023. At the close of the hearing on August 21, as he did upon the conclusion of the allegations phase of the disbarment proceedings, the special judge directed the parties to submit simultaneous proposed findings of fact and conclusions of law for the sanctions phase ninety days after the transcript was filed. The special judge noted that this would make the filings due on December 15, and both parties agreed that this deadline was satisfactory. The Committee filed its proposal in accordance with the special judge's direction, wherein it recommended that Bloodman be disbarred. Bloodman failed to file a timely proposal of her own. However, on December 26, Bloodman filed a motion to strike the Committee's recommendation for sanction, arguing, *inter alia*, that such a recommendation was not permitted under the

Procedures. On January 30, 2024, the special judge issued a letter opinion stating that the Committee's proposal was adopted in part but directed the Committee once more to make numerous revisions. Bloodman subsequently filed objections to the January 30 letter opinion as well as a motion for reconsideration. On February 2, the special judge entered his findings of fact, conclusions of law, and recommendation of sanction wherein he recommended that Bloodman be disbarred. Bloodman objected. On February 8, the special judge denied Bloodman's December 26 motion to strike, reasoning that section 13 of the Procedures allows the special judge to solicit proposed findings of fact and conclusions of law from the parties concerning the imposition of sanctions.

As an initial matter, while Bloodman does not challenge any specific finding of fact or conclusion of law in her briefs, she argues that the special judge impermissibly "rubber–stamped" the Committee's proposed findings of fact and conclusions of law despite her many objections to the proposal and adoption thereof. Section 13 of the Procedures provides, in relevant part, that in a disbarment proceeding,

> [t]he judge shall first hear all evidence relevant to the alleged misconduct and shall then make and file with the Clerk a written determination as to whether the allegations have been proven. Upon a finding of misconduct, the judge shall then hear all evidence relevant to an appropriate sanction to be imposed, including evidence related to the factors listed in Section 19 and the aggravating and mitigating factors set out in the American Bar Association's Model Standards for Imposing Lawyer Sanctions, sections 9.22 and 9.32 (1992). *See Wilson v. Neal*, 332 Ark. 148, 964 S.W.2d 199 (1998).

> The judge shall make findings of fact and conclusions of law with respect to the alleged misconduct of the respondent attorney and the imposition of sanctions . . . [and] [b]efore filing the findings and conclusions, the judge may solicit proposed findings of fact and conclusions of law from the parties and may submit a draft thereof to the parties or counsel for all parties for the purpose of receiving their objections and suggestions. The judge shall make a

14

recommendation as to the appropriate sanction from those set out in Section 17(D).[2]

Procedures, § 13(B)–(C).

Bloodman argues that the special judge did not honor the directives of section 13(B) and (C) of the Procedures, because in essence, he rubber-stamped the Committee's proposed allegations and sanction recommendation. We disagree. Following each phase of Bloodman's bifurcated disbarment proceeding, the special judge directed the parties to file proposed findings of facts and conclusions of law as section 13 plainly permits. Bloodman offers no convincing argument in support of her position that the special judge was somehow prohibited from doing so, and Bloodman chose not to timely file her own proposal concerning the recommended sanction. Contrary to Bloodman's argument, after hearing all witness testimony and evidence presented during the disbarment proceedings, the special judge was entitled to invite proposals setting forth findings of fact and conclusions of law with respect to Bloodman's alleged misconduct and the imposition of sanctions from the parties prior to making his final recommendation to this court.

## A. Conduct

From the pleadings, the entire record, and the evidence admitted during the allegations phase of Bloodman's disbarment hearing, the special judge found that 121 of the 176 counts brought by the Committee alleging violations of the Rules had been proved by a preponderance of the evidence. The Rule violations stemmed from Bloodman's conduct

---

[2]Section 17(D)(1) of the Procedures provides that disbarment, defined as "[t]he termination of the attorney's privilege to practice law and removal of the attorney's name from the list of licensed attorneys," is a sanction permitted upon a finding of misconduct.

in at least fifteen separate matters. From our review of the record, we cannot say that the special judge's findings are clearly erroneous.

To be sure, the magnitude of Bloodman's misconduct as outlined in the special judge's findings of fact and conclusions of law and proved through a voluminous record of evidence and witness testimony is troubling. Among Bloodman's many proven violations, there were sixteen violations wherein Bloodman knowingly engaged in dishonesty, deceit, fraud, or misrepresentation, and twenty-five violations wherein Bloodman's conduct was prejudicial to the administration of justice. The evidence demonstrates that, among other things, Bloodman has exhibited a pattern of making false statements to courts and disobeying court orders; collecting substantial legal fees, often five-figure sums, from her clients and failing to provide commensurate legal representation before withdrawing as counsel and failing to refund any portion of the unearned fees; mishandling and prolonging criminal appeals to such an unreasonable degree that the entire court of appeals referred her to the Office of Professional Conduct; and utilizing her law license as a means to delay proceedings and frustrate the legal process in bad faith in pursuit of personal matters. Moreover, Bloodman continued to practice law after her license had been suspended. Though, perhaps one of the most illustrative examples highlighting the extent of Bloodman's misconduct involves her representation of Kenneth Brown, Jr.

In March 2013, Kenneth Brown, Jr., was charged with nine felony counts of various offenses related to his involvement with a drug trafficking organization in a sealed indictment filed in the United States District Court for the Eastern District of Arkansas after he was arrested during a drug bust in Blytheville earlier that same year. Ten other people

were also charged in connection with the drug bust. Later that month, a bond hearing was conducted for Brown, who was represented by an appointed public defender. Shortly thereafter, Brown hired Bloodman to represent him and paid her a $25,000 fee. Brown told Bloodman early on that it was his desire to communicate with the government about cooperating in exchange for a favorable deal, but Bloodman discouraged him from making early contact with the government, advising Brown that she could beat the charges. When Brown was arrested in 2013, a cell phone that Brown had used in his drug dealings was delivered to Bloodman, along with Brown's personal cell phone. Bloodman told Brown that she could either deliver the phones to him in jail so that he could communicate with his business associates, or she could keep them in a safe and return them to Brown upon his release so that he could use them to get back into the drug business.

In the course of Bloodman's representation of Brown, Bloodman and Brown discussed the list of witnesses who had already negotiated plea agreements and were cooperating with the government against Brown, including Brown's co-defendants. In October 2013, Brown made a recorded telephone-conference call from jail to several contacts including his mother, sister, and another associate, discussing with them a suggestion made to him that he could arrange for persons not in custody to kill certain adverse witnesses to improve his position in his federal case. When asked about the source of this suggestion at Bloodman's disbarment hearing, Brown testified that Bloodman had advised him several times that he could "beat his charges" if he could make government-cooperating witnesses "go to sleep," which Brown asserted both parties understood to mean killing the witnesses.

17

In November 2013, Bloodman successfully motioned for a continuance of Brown's December 2, 2013 trial. The trial was continued to April 7, 2014, which gave Bloodman several months to prepare. In January 2014, a superseding indictment was filed against Brown, cleaning up the original indictment so that it included only the charges against him, and charging him with nine felony counts that were essentially the same as those charged in the initial indictment. In March 2014, Bloodman sought another continuance, reasoning that she would not be ready for trial in April. Specifically, she claimed that her email account had been hacked and that a virus had infected the hard drive of her computer, causing her to lose her trial notebook. Bloodman's motion was denied because the court found that there was ample time for her to prepare for the April 7 trial.

In the days leading up to trial, Bloodman filed several motions. On April 3, she filed a motion to dismiss or, in the alternative, to continue the April 7 trial. The same day, she filed a motion in limine seeking to exclude most, if not all, evidence against Brown on the basis that it was prejudicial. On April 4, Bloodman filed a motion to withdraw as Brown's counsel. She explained that she had not been adequately compensated for her representation of Brown, despite his earlier payment of the full $25,000 fee, and asserted that the superseding indictment had changed their contractual arrangement and allegedly caused her undue hardship. Bloodman was allowed to withdraw from the case, and counsel from the federal public defender's office was appointed to represent Brown going forward. Assistant United States Attorney Chris Givens, the lead prosecutor on Brown's case, testified at Bloodman's disbarment hearing that it was clear to him from the beginning of this case that Bloodman was very unfamiliar with federal law and that she was often nonresponsive to his

communications. Givens testified further that Bloodman was relieved from the case because she was unprepared, and the court did not believe she would ever be prepared. Prior to the court's ruling on Bloodman's motion to withdraw, Bloodman did not disclose to the court that she had devoted substantial time and effort to other cases in which she was pursuing personal interests—including a case filed by Bloodman pro se involving her minor son's participation on his school's basketball team and a case in which she challenged and appealed to exhaustion a $250 sanction imposed against her due to her failure to comply with a court order—during the continuance period between December 2013 and April 2014.

After Bloodman withdrew from Brown's case, Brown wrote to Givens from jail. He explained that he thought Bloodman had been ready to go to trial on April 7 as scheduled, and that he had been following Bloodman's lead since day one. Further, Brown wrote that he had wanted to speak to Givens, but Bloodman had kept him from doing so, assuring Brown that she could "beat it." Brown also wrote to Judge Leon Holmes asking what he could do about the $25,000 fee that his family and friends had collected and paid Bloodman to represent him. Givens testified at Bloodman's disbarment hearing that, by the time Brown eventually entered a guilty plea in December 2014, he was the last to do so among the eleven defendants originally charged.

Special Judge Smith found that Bloodman's actions violated the following Rules: 1.1; 1.2(d); 1.3; 3.2; 3.4(a); and 8.4(b)–(d).[3] To start, Bloodman counseled her client to arrange

_____

[3]Rule 1.1 provides that a lawyer "shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Ark. R. Prof'l Conduct 1.1.

for adverse witnesses in his case to be killed as a means of improving his chances of prevailing at trial. In other words, Bloodman advised her client to engage in conduct that any person, and especially a lawyer, would readily deem criminal in nature. Doing so was a clear abrogation of her professional obligations and violated many Rules. Moreover, Bloodman received, retained, and concealed Brown's business cell phone—material evidence of his criminal conduct—and represented to Brown that she would safeguard the phone until he was able to reclaim and use it to resume his criminal activity. Engaging in conduct of this nature can result in criminal repercussions under Arkansas law, and it reflects adversely on Bloodman's honesty, trustworthiness, and fitness as a lawyer. Additionally, Bloodman misrepresented in her motion to withdraw from Brown's case that Brown had not honored

---

[3] Rule 1.2(d) provides that a lawyer "shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law." Ark. R. Prof'l Conduct 1.2(d).

[3] Rule 1.3 provides that a lawyer "shall act with reasonable diligence and promptness in representing a client." Ark. R. Prof'l Conduct 1.3.

[3] Rule 3.2 provides that a lawyer "shall make reasonable efforts to expedite litigation consistent with the interests of the client." Ark. R. Prof'l Conduct 3.2.

[3] Rule 3.4(a) provides that a lawyer "shall not . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act[.]" Ark. R. Prof'l Conduct 3.4(a).

[3] Rule 8.4 provides, in relevant part, that "[i]t is professional misconduct for a lawyer to . . . (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) engage in conduct that is prejudicial to the administration of justice[.]" Ark. R. Prof'l Conduct 8.4(b)−(d).

his contractual obligations to her even though he had paid the full quoted fee early in the representation. Aside from that, Bloodman lacked the required knowledge, skill, thoroughness, and preparation necessary to effectively represent Brown, and she failed to act with diligence in her representation of him. She was unprepared for Brown's trial despite obtaining a continuance, using the months leading up to Brown's trial date to instead pursue personal legal matters; failed to explore his desire to cooperate with the government; and delayed the resolution of his case. Based on a review of the record—as we conclude with respect to each violation now before the court—the special judge's findings are not clearly erroneous.

## B. Aggravating and Mitigating Factors

The purpose of disciplinary actions is to protect the public and the administration of justice from lawyers who have not discharged their professional duties to clients, the public, the legal system, and the legal profession. *Newman*, 365 Ark. at 516, 231 S.W.3d 667. When the Rules have been violated by either serious or lesser misconduct, a penalty phase proceeds in which the defendant attorney and the Committee's executive director are allowed to present evidence and arguments regarding aggravating and mitigating factors to assist in determining the appropriate sanction. *See Tapp*, 2017 Ark. 185, at 10, 519 S.W.3d at 322. The following aggravating factors were developed by the American Bar Association Joint Committee on Professional Standards and adopted by this court in *Wilson v. Neal*, 332 Ark. 148, 964 S.W.2d 199 (1998):

(1) prior disciplinary offenses;

(2) dishonest or selfish motive;

(3) a pattern of misconduct;

(4) multiple offenses;

(5) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with these Procedures or orders of the Committee;

(6) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(7) refusal to acknowledge the wrongful nature of the conduct;

(8) vulnerability of the victim;

(9) substantial experience in the practice of law;

(10) indifference to making restitution; and

(11) illegal conduct, including that involving the use of controlled substances.

Mitigating factors are:

(1) absence of a prior disciplinary record;

(2) absence of a dishonest or selfish motive;

(3) personal or emotional problems;

(4) timely good faith effort to make restitution or to rectify the consequences of the misconduct;

(5) full and free disclosure to the disciplinary board or cooperative attitude towards the proceedings;

(6) inexperience in the practice of law;

(7) character or reputation;

(8) physical disability;

(9) mental disability or chemical dependency including alcoholism or drug abuse when:

(a) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(b) the chemical dependency or mental disability caused the misconduct;

(c) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(d) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(10) delay in [the] disciplinary proceedings;

(11) impositions of other penalties or sanctions;

(12) remorse;

(13) remoteness of prior offenses.

*Tapp*, 2017 Ark. 185, at 10–12, 519 S.W.3d at 322–23; *see also* Procedures § 19(B)–(C).

Special Judge Smith found that the following aggravating factors applied: (1) a pattern of misconduct; (2) multiple offenses; and a (3) refusal to acknowledge the wrongful nature of her conduct. Specifically, the special judge noted that Bloodman demonstrated a pattern of misconduct for more than five years prior to the interim suspension and committed 121 separate violations of the Arkansas Rules of Professional Conduct, all while denying having violated even one Rule. Conversely, Special Judge Smith found that the following mitigating factors applied: (1) the absence of a prior disciplinary record; and (2) a delay in the disciplinary proceedings.

## C. Sanction

We must now determine the appropriate sanction in this case. Pursuant to section 17 of the Procedures, violations of the Rules fall into two separate categories of misconduct:

23

serious misconduct and lesser misconduct. *Dunklin*, 368 Ark. at 462, 247 S.W.3d at 511. Serious misconduct warrants a sanction terminating or restricting the lawyer's license to practice law, whereas lesser misconduct does not. *Ligon v. McCallister*, 2020 Ark. 81, at 6, 593 S.W.3d 461, 464. Section 17(B) of the Procedures provides that conduct will be considered serious misconduct if any of the following considerations apply:

(1) The misconduct involves the misappropriation of funds;

(2) The misconduct results in, or is likely to result in, substantial prejudice to a client or other person;

(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the attorney;

(4) The misconduct is part of a pattern of similar misconduct;

(5) The attorney's prior record of public sanctions demonstrates a substantial disregard of the attorney's professional duties and responsibilities; or

(6) The misconduct constitutes a "Serious Crime," as defined in these Procedures.

Special Judge Smith found that Bloodman had committed 121 separate Rule violations, that these numerous violations constituted "serious misconduct" pursuant to section 17(B) of the Procedures, and that the violations greatly outweighed the two mitigating factors discussed above. Notably, as discussed above, the special judge pointed out that there were sixteen proven violations wherein Bloodman knowingly engaged in dishonesty, deceit, fraud or misrepresentation, and twenty-five proven violations wherein Bloodman's conduct was prejudicial to the administration of justice. For these reasons, the special judge determined that disbarment is the appropriate sanction. Bloodman argues that

24

we should reject the special judge's disbarment recommendation because the evidence presented does not support such an extreme sanction. We disagree.

In light of the record and our discussion above, it is clear that Bloodman has engaged in systematic abuse of the legal system for years, both personally and professionally. Bloodman's misconduct across the fifteen separate matters yielded 121 violations of the Arkansas Rules of Professional Conduct involving "serious misconduct," and was thoroughly detailed in the special judge's findings of fact and conclusions of law. This misconduct seriously undermines the confidence that the public places in the legal profession. *See Tapp, supra.* The proven violations are further exacerbated by the fact that the evidence demonstrates an ongoing pattern of misconduct in the years leading up to, and at times persisting after, the interim suspension of Bloodman's license to practice law, and that Bloodman has not acknowledged the wrongful nature of her conduct. We therefore accept Judge Smith's recommendation and enter an order of disbarment.

Order of disbarment issued.

Special Justices JEFFREY HATFIELD and LAUREN BALLARD join.

WOOD and HILAND, JJ., not participating.

*Charlene A. Fleetwood*, Arkansas Supreme Court Office of Professional Conduct, for petitioner.

*Terrence Cain*, for respondent.